Argued and submitted February 1, reversed and remanded with instructions June 26, 2002

In the Matter of Mary Nguyen
and Martha Nguyen, Minor Children.

STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY;
Mary Nguyen;
and Martha Nguyen,
*Appellants,*

*v.*

THANH-HOA THI NGUYEN,
aka Thanh Nguyen;
and Cao Thai Nguyen,
aka Cao Nguyen,
*Respondents,*

*and*

Peggy SPERR,
Court-Appointed Special Advocate,
*Respondent.*

1999-821161 and 1999-821162; A115763

48 P3d 864

Michael Livingston, Assistant Attorney General, argued the cause for appellant State ex rel Juvenile Department of Multnomah County. With him on the briefs were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Kathryn Underhill and Juvenile Rights Project, Inc., filed the brief for appellants Mary Nguyen and Martha Nguyen.

Emily S. Cohen argued the cause and filed the brief for respondent Thanh-Hoa Thi Nguyen.

Laurie Bender argued the cause and filed the brief for respondent Cao Thai Nguyen.

James N. Westwood and Stoel Rives, LLP, waived appearance for respondent Peggy Sperr.

Before Armstrong, Presiding Judge, and Kistler and Brewer, Judges.

KISTLER, J.

## KISTLER, J.

The trial court dismissed the state's petition to terminate mother and father's parental rights. The state appeals. On *de novo* review, we reverse.

On September 30, 1999, father took his four-month-old daughter Martha to a regularly scheduled well-baby examination. In the course of the examination, father mentioned some tenderness in the baby's arm and told the physician about "a history of arm swelling and lower leg swelling." Because an x-ray revealed fractures of the baby's long bones, the doctor sent the baby to inpatient services at Emanuel Hospital for further evaluation. At Emanuel, Dr. Mike Lukschu concluded, based on abnormalities in the x-rays, that additional testing should be done. He ordered a skeletal survey, blood tests, and a CT scan.

The skeletal survey showed that the bones in Martha's arms and legs had been broken 12 times on at least three separate occasions. Martha's right arm had been broken twice. One fracture was 10 to 14 days old; the other was 14 to 21 days old. Her left arm had been broken three times. Two fractures were 10 to 14 days old; the third was 21 to 42 days old. Her left leg had been broken two times. Both fractures were 10 to 14 days old. Martha's right leg had been broken three times. Two of the fractures were 10 to 14 days old; the third was less than 72 hours old. All the fractures to Martha's arms and legs were metaphyseal fractures or fractures of the growing part of the arm and leg bones.[1]

Dr. William Bennett testified that "[t]hese fractures are caused by violent twisting and jerking movements of the extremities." In describing the amount of force necessary to cause the fractures, Lukschu explained that it would take the same amount of force to cause the fractures that Martha had suffered as it would to break the drumstick bone in a turkey.

---

[1] The radiologist explained:

"The metaphysis is * * * that part of the bone on either end of the shaft [or diathesis] where all the growth takes place. * * * A metaphyseal fracture involves the growth plate of the growing bone. It's the most susceptible area of the fracture [sic], since it involves transformation from cartilage in the bone, and it's also a classic fracture of nonaccidental trauma."

Bennett and Lukschu differed on the extent to which Martha's injuries would be apparent to an observer. Bennett explained that "[t]hese are very painful injuries." As a result of the injuries, Martha would be "fussy and crying, not want to move the extremity. The extremity would be swollen." The swelling, however, would probably go away within four days after the fracture occurred. Lukschu testified that these kind of fractures in infants can result in a wide range of symptoms—anywhere from nothing to severe pain. He noted, however, that Martha had exhibited some symptoms of pain when she was taken to the clinic. He explained that, when "we were moving her extremities, it seemed to be tender for her." She was "fussy." "She wasn't, you know, a happy baby, but I don't think she was constantly crying, either."

The skeletal survey also revealed that Martha's skull had been fractured. Bennett initially determined that there was some scalp swelling present, which allowed him to date the skull fracture at 72 hours old or less. Later, he reviewed the x-rays with Lukschu and decided that there was insufficient swelling to allow him to date the fracture accurately. Bennett told the court that, "for a fracture like that to occur innocently, a child of this age would have to be dropped on their head from a height of five feet on a very hard surface, such as concrete." He agreed on cross-examination that it was possible that Martha's skull might have been fractured by an instrument such as a glass bottle but only "[i]f you could swing it hard enough." Based on the number of fractures, their pattern, and the fact that they resulted from multiple incidents, Lukschu concluded that this was "a classic case of abusive injury."

After the doctors discovered the extent of Martha's injuries, a police detective spoke with father and mother separately. When the detective told father that his daughter "had broken bones all over [her] body," "[h]e was very sad and he cried." When the officer told mother the same information, "she didn't really say anything or show * * * emotion." Mother cried only when she was told, at the end of the interview, that the state was going to take custody of her two children as a result of the injuries. During their interviews, both parents explained that Martha had been exclusively in their care. They could not identify any accident that might have

caused their daughter's injuries, and each maintained that the other had not caused them. Although both parents wondered whether they might have wrapped Martha's blanket too tightly, the evidence established that Martha's injuries were not caused by too tight a blanket.[2]

As a result of the doctors' findings and the parents' interviews, the State Office for Services to Children and Families (SCF) placed Martha and her 15-month-old sister Mary in foster care. In October, the parents and the SCF case worker participated in a family decision meeting and developed a service agreement. The primary need identified in the agreement was to "provide for the safety of the children." To that end, mother and father began a parenting class through Lutheran Family Services and the Asian Family Center.[3] The curriculum included instruction on "stress and anger management, establishing family rules, discipline alternatives, family problem-solving," and "cross-cultural issues and American culture."

Mother and father also participated in approximately 25 supervised visits with their children. Doneena Caster, an SCF human services assistant, described the parents' interactions with Martha and Mary as "very good visits" that were "comfortable, calm, balanced." According to Caster, mother's care of Martha was appropriate. Caster confirmed that father also appeared to be "loving, attentive and concerned for his children."

Mother and father underwent mental health evaluations at the request of their attorneys. Dr. James Boehnlein, who has experience working with Southeast Asian clients, evaluated father in November. Using an interpreter, Boehnlein interviewed father about his history and reviewed SCF, police, and medical reports detailing Martha's injuries. Boehnlein concluded that father "does not currently have a psychiatric disorder or evidence of a personality disorder," nor did he have any "predisposing risk factors to violent behavior." Boehnlein did not have an opportunity to observe

---

[2] The doctors also ruled out medical problems, such as infection, metabolic disorder, vitamin deficiency, bone disease, or cancer, as the cause of the fractures.

[3] Mother and father are Vietnamese immigrants.

father with his daughters, but he noted that "there is nothing in the individual psychiatric examination that would suggest that he is unfit as a parent or that he has a diminished capacity to parent his daughters."

Mother was evaluated by Dr. Paul Leung, who was also chosen in part for his familiarity with Vietnamese culture. Leung concluded that mother "enjoyed a very healthy mental [and] emotional condition" before the discovery of Martha's injuries and removal of her children and that she was capable of providing adequate parenting for her daughters.[4] Leung explained, however, that, if mother had caused Martha's injuries "out of stress" and "being overwrought," he would "have very much concern about the ability of this woman to care for these two children" and would recommend "additional treatment to the mother [and] the father."

In February 2000, the juvenile court held a hearing on the state's petition to take jurisdiction of the children. The court found that the parents "love their children and wish and want to care for them" but that they had offered no adequate explanation for the injuries that Martha had sustained while in their care. The court found beyond a reasonable doubt that the injuries were not accidental, that Mary had not caused them,[5] and that Martha had been in the exclusive custody of her parents. The court explained:

> "It is plausible in the Court's view that these injuries reflect frustration and being overwhelmed by a caretaker, trying to deal with two young children, one of whom is a fussy baby. I don't believe that either parent set out to cause severe injury to this child. But in their physical custody that's exactly what happened.
>
> "* * * What is proposed here by [parents' attorneys] is that the Court can return this child to the custody of these parents where these very severe injuries occurred without

---

[4] Neither Boehnlein nor Leung administered standardized psychological tests because they considered the evaluative tests culturally inappropriate for their clients. Instead, their diagnoses relied primarily on self-reporting by mother and father.

[5] At the jurisdictional hearing, the parents suggested that their 15-month-old daughter Mary could have been the cause of Martha's injuries, but the doctors uniformly testified that Mary was not physically capable of inflicting the injuries that Martha had sustained.

any further treatment, without any acknowledgment on the part of either parent how they occurred, and that they occurred at the hands of one of the parents. I think that would be unconscionable and place both children at great risk.

"The idea that a child only 11 months different in age receives at least on three separate occasions a skull fracture and 11 or 12 breaks in her bones, and that we're going to put the other child back into that environment without any acknowledgment as to how those injuries occurred other than we know that one of the parents caused them, and no treatment, is, in my mind irresponsible to do that."

Consistently with that concern, the court explained that "one of the biggest obstacles" that had to be overcome before reunification could occur was "knowing how the child was injured and having an acknowledgment of responsibility and the ability to offer treatment." Disposition was set over until March "for preparation of [a] detailed case plan." The court ordered the parents to continue psychological counseling in the interim and to participate in the treatment recommended by SCF and Lutheran Family Services.

The parents followed through with nearly all of the service agencies' recommendations. SCF requested additional psychological evaluations of both parents, conducted by Dr. Sofia Hang. Hang's diagnosis revealed no underlying psychological problem that would have caused either parent to harm Martha, but Hang recommended that both parents participate in individual counseling. She also suggested that mother "establish a supportive network for herself" to avoid becoming isolated and dependent on father's family. Canh Nguyen provided couples therapy to the parents and individual therapy for father. His therapy for father appeared, in substantial part, to be directed to helping father deal with the sadness and depression resulting from losing his children. Nguyen found no personality characteristic in mother that would make it likely that she would have harmed the children. His impression of both parents was favorable, but he acknowledged that he would have second thoughts if it was demonstrated to him that one of the parents had caused Martha's injuries.

Kim Pham also provided individual therapy for mother. Pham did not diagnose mother as suffering from depression before the children were removed from her care. Rather, she testified that mother had become depressed over the loss of their children and the resulting isolation from the Vietnamese community.[6] Pham explained that, despite those problems, mother had seemed to function fairly well and had worked on becoming more independent.[7] In Pham's opinion, mother had a strong relationship with her husband, who had been very supportive. The court also ordered observation of the parents and children by Renee Hershey, an expert in analyzing foster children's attachment needs. Hershey testified that the parents were attentive and appropriate during her observations.

Although the parents complied with almost all the court's conditions, they failed to satisfy the court's primary concern: They could not or would not explain the cause of Martha's injuries. That condition had been included in a March 2000 service agreement, which had specified that one goal of the parents' mental health therapy was to "arrive at an explanation for Martha's injuries." SCF also had discussed the importance of obtaining information about the cause of the injuries directly with the counselors and repeatedly with the parents. Both parents understood that that information was critical to getting the children back, but mother and father reiterated that they had no idea of how Martha had been injured.

The only information that the parents offered to explain Martha's injuries was a report to their counselor and to their attorneys that Martha had twice spent time with other adults: Relatives had passed the baby around at her baptismal ceremony in August and, on another occasion, an elderly aunt had watched Martha while the family moved. Mother and father, however, did not notice anything unusual

---

[6] Pham testified that "[t]o the Vietnamese community this is a big deal especially [if] you lost your kids, you know."

[7] Pham testified:

"She seem[s] to function pretty well especially with her situation, but she [has] tried to keep up with her school, her daily activities, and tried to be busy with her life. She [is] involved with the church, with the choir, with her community, go[es] to school, to handle her depression."

about Martha after either the baptismal ceremony or the time she spent with her aunt. The parents did not suspect that the aunt had caused the injuries; rather, they reiterated that they were "not sure what happened to Martha."

The state petitioned for termination of mother and father's parental rights in September 2000, alleging that the parents were unfit by virtue of the serious physical abuse that Martha had suffered. Trial was set for February 2001 but postponed. The parties agreed to review a proposal by the parents to have an acquaintance live with the family to assist with and supervise the children's care. SCF, however, rejected the plan as unworkable, and the case went to trial on the state's termination petition in July 2001.

At the time of trial, the children had been in foster care for over a year and a half, and the parents had been participating in therapy for nearly a year. At trial, several witnesses testified that the parents' unwillingness or inability to acknowledge and explain the abuse made it unsafe to return the children to their parents. Hershey explained that, in assessing the children's safety, it was necessary to know both who had harmed the child and what had caused the harm. She testified:

> "The primary, the most important thing in assessing child safety if they have already been harmed is understanding who harmed the child, what were the triggering events that led up to the abuse, what kind of things can the family do to then put in a safety plan that will prevent that harm from happening again. And without knowing who the perpetrator of the abuse is, I don't know how you can make an appropriate safety plan."

Dr. Eric Johnson, a psychologist with extensive experience treating child abusers, explained that a person must acknowledge having abused a child before the person can be treated. Unless and until the problem that caused the abuse is identified, it cannot be remedied. As Johnson explained, "If you don't know what the problem is, you cannot enter into treatment. You cannot undertake effective treatment. You don't know what you are treating." Accordingly, he concluded that it is "vitally important" for the abuser to acknowledge that he or she abused the child and to begin working on the

problem that caused the abuse.[8] The parents' witnesses did not directly disagree with that basic proposition. Rather, they appear to have concluded, based on the parents' self-reports, that mother and father were loving parents who were not capable of committing the abuse that Martha had suffered.

The trial court found that the state proved that, "[a]t four months, Martha was diagnosed with a skull fracture and multiple old and new bone fractures. The parents have no explanation for Martha's injuries." The court found that, despite Martha's injuries, her parents were not "incapable of parenting." It reasoned:

> "Based upon the testimony of all the witnesses in this case, the Court finds that there is no reason to believe that [mother and father], or either of them, is incapable of parenting. The Court is fully cognizant of the serious nature of the injuries that the younger child sustained. While child abuse continues to appear to be the most likely explanation of the injuries, the fact remains that these are, by all accounts, extraordinarily capable and fit parents who are open to change, to training and are fully competent to parent."

Consequently, the court dismissed the petition to terminate parental rights. The state has appealed from the trial court's order dismissing the petition.

ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights. *State ex rel SOSCF v. Stillman,* 333 Or 135, 145, 36 P3d 490 (2001). The state must prove by clear and convincing evidence that (1) the parents are presently "unfit by reason of conduct or condition seriously detrimental to the child" and (2) integration into the parents' home is "improbable within a reasonable time" because the conduct or condition is "not likely to change." *Id.* at 145-46. If the parents are presently unfit and integration

---

[8] Johnson explained that it is also problematic if one spouse is unaware that the other is abusive. He testified:

"It raises serious issues. The major problem there is at a minimum you have got a parent who is in the dark and is unaware their child is endangered. They can't identify what the risks, signs are, what the triggers are. They can't be effective in running interference and stopping situations from escalating out of control."

is not probable within a reasonable time, the remaining question is whether termination is in the child's best interests.

■    We begin with the question whether the parents are presently unfit. On that issue, mother and father advance two arguments. They argue initially that the state failed to prove that they were responsible for the injuries Martha suffered. Mother argues, for example, that "there is no evidence that either parent has ever been rough or cruel to either of their children." Both parents argue alternatively that, even if there were evidence that one of them had caused Martha's injuries in the past, the state still failed to prove that they are presently unfit.

We find that the state has proved by clear and convincing evidence that either mother or father caused Martha's injuries. The multiple fractures that Martha suffered did not result from any medical condition. They were not accidental. They were instead the product of child abuse. Except for two instances, Martha was exclusively within her mother and father's care. Although mother and father suggest that Martha may have been injured when she was twice out of their care, the two times that she left their care cannot explain the three instances of abuse she experienced. Moreover, mother and father did not notice anything unusual when Martha returned either from her baptism or from her aunt's care. On this record, the evidence is clear and convincing that one parent caused Martha's injuries and that the other was either unaware of or did nothing to prevent it.

Both parents argue that, even if one of them were unfit in the past, the state still failed to prove that they are presently unfit. They argue that they "have embraced mental health therapy and parenting resources, as if one of them [had] caused the injuries." We acknowledge that mother and father have participated in and successfully completed numerous services. For example, mother and father successfully completed a 12-week course that addressed different parenting topics for one hour each week. While the parents' participation in that course, as well as others, has been exemplary, completing generalized course work does not address the specific problem that caused Martha's injuries. *See State ex rel SOSCF v. Frazier*, 152 Or App 568, 586-87, 955 P2d

272, *rev den* 327 Or 305 (1998). If, as we find, either mother or father repeatedly broke their four-month-old daughter's bones, the expert testimony in this case establishes that mother and father must acknowledge the problem, identify its cause, and work to correct it. *See State ex rel Juv. Dept. v. Ostrer*, 172 Or App 571, 581-82, 19 P3d 980, *rev den* 332 Or 326 (2001) (holding that the mother's failure to acknowledge that her husband had abused their child and to separate from him rendered her unfit). Unless and until the parents take those steps, and they have not done so, their generalized participation in services does nothing to cure the specific problem that led to Martha's injuries. We find that mother and father are not presently fit. *See id.*[9]

■     The second question under *Stillman* is whether integration into the parents' home is "improbable within a reasonable time" because the conduct or condition that renders them unfit is "not likely to change." 333 Or at 145-46. The answer to that question follows directly from our conclusion that mother and father are not presently fit. Mother and father consistently have been unable or unwilling to acknowledge responsibility for Martha's injuries and take specific steps to deal with the cause of those injuries.[10] We cannot rely on the possibility that real and lasting changes will occur "within a reasonable time" when, despite participation in social services and separation from their children since 1999, the parents have yet to identify the cause of the abuse and take specific steps to remedy it.

■     The remaining question is whether termination is in the children's best interests. We recognize that the parents love their children, and we are aware of the benefits to the

[9] To be sure, mother and father presently appear to be capable parents. But they also appear to have been capable parents before Martha's injuries were discovered. At that point, however, one parent was repeatedly abusing their daughter, and the other was either unaware of the abuse or did nothing to prevent it. The parents' present outward appearance provides little assurance that their children will be safe in their home.

[10] Mother argues that the children can be integrated into the home because a third person would stay in the home and monitor the children's safety. The third person, however, would be in the parents' home only for a temporary period. Even if the third person could protect the children while she was present, her presence does nothing to assure their safety when she leaves. Mother's proposed solution does not resolve the underlying problem; it merely delays its effect.

children of being able to remain in their parents' home. However, in the absence of any real change on the parents' part in dealing with the cause of Martha's injuries, the overriding concern for the children's safety convinces us that termination is in their best interests. *See State ex rel Juv. Dept. v. Proctor*, 167 Or App 18, 33, 2 P3d 405, *adh'd to on recons* 169 Or App 606, 10 P3d 332 (2000). We accordingly reverse and remand with instructions to enter a judgment terminating both parents' rights.

Reversed and remanded with instructions to enter judgment terminating both parents' rights.