Argued and submitted May 10, 2005, affirmed February 8, 2006

In the Matter of
Laveena Rodgers, a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

Joseph RODGERS,
*Appellant.*

02-00180JV; A126377

129 P3d 243

James J. Spindor argued the cause and filed the brief for appellant.

Paul L. Smith, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Linder, Presiding Judge, and Haselton* and Ortega, Judges.

ORTEGA, J.

---

* Haselton, J., *vice* Ceniceros, S. J.

### ORTEGA, J.

Father's parental rights were terminated based on unfitness, ORS 419B.504, and neglect, ORS 419B.506, because of his failure to engage in counseling after his infant daughter suffered a serious and unexplained injury while in his care. Mother relinquished her parental rights and is not a party to this appeal. Father challenges the termination, and the Department of Human Services (DHS) cross-assigns error to the juvenile court's finding that the state failed to prove that father was unfit because of abuse of alcohol or controlled substances. We review *de novo*, ORS 419A.200(6)(b), giving considerable weight to the juvenile court's findings regarding credibility, and affirm the termination of father's parental rights based on unfitness, though for reasons slightly different from those relied on by the juvenile court. We agree with the juvenile court that there was insufficient evidence of abuse of alcohol or controlled substances to support a finding of unfitness, although issues relating to father's alcohol use figure into our determination that father is unfit.

Rather than try to arrange all of the detailed factual information chronologically, we begin with a brief chronological overview of the case and then examine in detail clusters of facts—events preceding child's being taken into DHS custody, the services that were offered to father, issues surrounding father's visits with child (including the effect of father's failure to submit to urinalysis), and father's failure to participate in counseling.

Father's parental rights were terminated when child was about two and a half years old. Child was born in February 2002 and was taken into DHS custody the following April, when she was about 10 weeks old. When child was born, mother was 15 and father 16. The juvenile court took jurisdiction over child and mother at a hearing in June 2002. Because of delays attributable to father's changes in counsel, however, the court did not take jurisdiction over father until January 2003, nine months after child was taken into DHS custody, and father declined to sign any service agreements or, for the most part, to participate in services until after the

court took jurisdiction over him. Initially, services were offered to father and mother with the goal of reuniting the family, but DHS ultimately concluded that they were not making adequate progress. In late July 2003, DHS changed the plan from reunification to adoption. The petition to terminate father's parental rights was filed in late October 2003. Mother relinquished her parental rights in February 2004. The hearing on the termination of father's parental rights was held in July and August 2004. The juvenile court terminated father's rights in October 2004.

With that general timeline in mind, we turn to a more detailed examination of the facts, beginning with events that took place before child was placed in DHS custody. When child was born, father and mother faced significant challenges. Mother had been diagnosed with bipolar disorder, and she stopped taking her medication for a period around the time of child's birth. Father had received about a sixth-grade education from home-schooling. In May 2000, when he was 14, father was referred to the county juvenile department for being a minor in possession of alcohol. Father was under the supervision of the juvenile department for three months beginning in August 2000 and then again from October 2001 (about four months before child's birth) until about September 2003. By that time, father had been on probation for unauthorized use of a vehicle, driving while suspended, two incidents of minor in possession of alcohol (a third incident was not adjudicated), and third-degree theft; he also had been in a diversion program for driving under the influence of intoxicants.

In March 2002, about a month after child's birth, an incident of domestic violence occurred between father and mother in child's presence. At the time, father and mother gave opposing accounts of the incident; we know little about mother's version, except for some brief testimony at the jurisdictional hearing, in which she indicated that father was holding her chin and "trying to get [her] to listen." Father testified that mother became upset because he was going to work and that he decided to remove child from the home because mother was upset and "screaming." He reportedly told mother that he was leaving and taking child, and, after he picked up child, mother hit him in the face. He testified,

"So I walked out the door and [mother] was threatening to kill herself, and I didn't want her to kill herself and then, then say I did it, and I left, you know. And I was nervous, I didn't know what to do, so I went over to KMart and I called the police and I told them that she was threatening to kill herself."

The police officer who responded to the call separated father and mother by removing father from the scene and leaving child with mother. The officer did not arrest either parent but testified later that, at least under current policies, arresting someone "would have been * * * an option * * *." He stated that no case was filed because neither party wanted to pursue charges. The police officer also contacted DHS about doing a welfare check on parents. DHS presented father and mother with a safety plan that required mother to take her medications and parents not to have additional incidents of domestic violence. DHS also offered services, which father declined.

A little over a month later, in late April, father took child to the hospital with a transverse fracture in her right femur. At the hospital, father provided inconsistent stories about how the injury occurred. He initially told DHS caseworker Fenner and police officer Piazzini, a child abuse investigator, that he had been sitting and feeding child when she arched her back, slid off his legs, and landed on the floor. Fenner left the room where she and Piazzini were interviewing father to talk with another DHS caseworker, who told Fenner that mother had just given a different account of events. Fenner pulled Piazzini into the hall to tell him about the different stories. When they returned to the room, Fenner heard father on the phone saying, "What did they ask you?" Fenner suspected that father was speaking to mother; indeed, Piazzini testified that father admitted at the time that he had been on the phone with mother. However, father later testified that he had tried to reach mother by phone but no one was home.

After Fenner and Piazzini returned to the interview room, father gave them a new account of child's injury; he stated that, while he was holding child in one arm, he reached into a closet to get some books for mother and child fell out of his arms onto the floor without hitting anything on the way down. After Piazzini expressed skepticism about

whether those events could have caused the injury, father stated that he was trying to keep child from falling by pressing his arm against her leg and that when child fell, he caught her and that she did not hit the floor. Because Piazzini could not establish that child had been intentionally injured, no criminal charges were filed.

At the termination hearing, father testified that he was holding child and reached for some books, that child leaned back and started to fall, and that he tried to grab her; he stated that he "really [did not] know what happened, if she hit the floor[;] * * * it happened too fast * * *." He stated that he immediately called his sister to take child and him to the hospital. Dr. Calvert, a doctor who has received special training in recognizing child abuse, testified that, when such a young child suffers a transverse fracture, 70 to 75 percent of such cases involve abuse and 25 to 30 percent are accidental. He testified that the version of events recounted by father— that child leaned backward while father held her legs to keep her from falling—seemed unlikely. Calvert explained, "That would seem like there wouldn't be sufficient force to break the femur[;] that's a pretty, pretty solid bone even in a two month old. I'm just speculating, but I've certainly not heard of that happening * * *." He added that "it's not uncommon that you'll almost lose a child and grab them like that[,]" suggesting that he would have heard of similar occurrences of injuries if father's explanation were plausible. Calvert nevertheless acknowledged that child's injury could have been accidental.

After child was injured, DHS took her into custody. Child's foster mother testified that, when child arrived from the hospital, child was in pain because of the broken leg, but was clean and well fed.

Before and after child was taken into custody, DHS offered father services. However, as we explain in some detail below, DHS and father disagreed about father's need for services, and father resisted nearly all of the services that DHS offered. Despite those disagreements, the court found at each review hearing during the course of the case that DHS was making reasonable efforts to reunify the family.

Before the court took jurisdiction over him in January 2003, father voluntarily participated in the Healthy

Start program, which teaches parenting skills to first-time parents. DHS employees and father had different views of father's participation in the program. For example, one of the DHS visit supervisors felt that father did not listen to Healthy Start's instruction or suggestions or try to change his behaviors. Father, on the other hand, testified that he listened to the Healthy Start employees, but believed they were helping mother and were not trying to help him. Father stopped participating in the Healthy Start program at some point in 2003.

Father also testified that, early on and for a short period, he went to some of mother's counseling sessions to gain a better understanding of mother's bipolar disorder. Bailey-Lewis, the first DHS caseworker on the case, understood that father was receiving counseling from mother's counselor, Peoples, but had no documentation of the counseling. Holmes, the DHS caseworker who assumed responsibility for the case in November 2002 and who spoke with Peoples several times, was never advised by father or Peoples that father was receiving counseling from him.

Starting in July 2002, father also took—and eventually successfully completed—a 17-week parenting class. He felt that he learned from the class, and a "post test" showed that father had progressed in the class. Bailey-Lewis, however, testified that the reports of the instructor were "not always positive" and that father missed many classes. She also found father in general to be "a bit angry and sullen and combative" in connection with the services that were provided to him. In addition, father failed to complete the class by taking the post test until March 2003, several months after the class was over. Father testified that the first he knew about the test was when Holmes called him that March to tell him that he would be required to retake the class if he did not complete the test immediately. However, we do not find that testimony plausible. Holmes testified that she had informed father in several ways before that phone call that he needed to complete the test. In addition, the February 2003 service agreement that father signed stated that he would complete his post test and that the instructor could not provide a report until after father completed the test.

During the time that the services addressed above were being provided, father and mother were participating in visits with child. By September 2002, DHS visitation center staff became concerned that father was being too controlling of mother, often giving her orders during visits. Five months later, DHS decided to separate father's and mother's visits with child to allow mother to have more autonomy during visits.

Over time, the visitation staff also began to feel that father was too controlling of child. Although the examples that they offer—such as whether father should have left child in the visitation room rather than in a hallway when he went to the restroom—seem minor when considered in isolation, taken together, the examples suggest that the staff concerns may have been legitimate. Although father testified that he let child play with whatever toy she chose, one staff member described an incident when father wanted child to play with a toy that child did not want to play with; father took child by the wrist and walked her over to the toy. The staff member also commented that father had shown "[a]gitation" and had thrown toys "pretty abruptly" into the toy box while child had a "blank look" on her face. Another staff member commented that father failed to acknowledge child's growth and development, noting that he would sit child on his lap and feed her even when she was old enough to sit in a booster seat and feed herself. She further stated:

"[B]ecause [child is] kind of independent, she picks what she wants to do. * * * [Father] does ask her, you know, 'Do you want to go outside or [do] you want to do this?'

"* * * * *

"[I]f he wants to give her a hug or whatever, she says, 'No,' you know, or turns to me.

"* * * * *

"Well, he makes her follow through with what he, what he wants her to do. This is how it is."

Father exhibited some positive behaviors during visits, particularly during the six months before the termination hearing—bringing child snacks and gifts, keeping good control of child to keep her safe, telling her that he loved her, and

playing with her. However, both Bailey-Lewis and Holmes felt that father did not seem to be applying the lessons learned in his parenting class, and the visit supervisors did not find father to be receptive to their suggestions. Indeed, father's testimony suggests that he resented what he perceived as interference with his time with child; in his view, the visit supervisors were "distract[ing from] my visit, and I only get one hour and [the supervisor is] going to sit there and talk to [child] half my visit."

In addition, father was not consistent with attendance at visits. The rules of the visitation center require that if a parent does not appear for a visit, he is required to confirm visitation in the future by calling on the morning of the next visit; failure to call means that the visit is cancelled. After father failed to comply with this rule for his Friday visits on three occasions, he was removed from the Friday visitation schedule. By the time of the termination, father had been on a Monday-only schedule for months.

Father also missed visits because he failed to cooperate with testing for alcohol use. At this point, we must digress briefly from the visitation issue to provide background regarding DHS's concern about father's use of alcohol. As noted, father had committed offenses involving alcohol and was under supervision of the county juvenile department from about four months before child's birth until September 2003. In February 2003, in the course of an incident involving mother, father violated the terms of his probation by consuming alcohol. Although the record is not entirely clear about what happened, it appears that mother attempted suicide; father had been at mother's home and then tried to visit mother in the hospital against the wishes of mother's sister (who was acting as mother's guardian).[1] When father tried to visit mother in the hospital, mother's guardian called 9-1-1 because she felt threatened by father. When police arrived at the hospital, father had already left, but he was later taken into custody for a probation violation, apparently for use of alcohol. The officer who took father into

---

[1] As a result of the incident, a no-contact order for father and mother was entered, reportedly with the support of mother's therapist.

custody detected the odor of alcohol on his breath, but did not think that he appeared intoxicated.

After that probation violation, DHS and father's probation officer agreed that father needed to undergo further drug and alcohol treatment. Father had previously participated in drug and alcohol counseling as part of a DUII diversion program; after the February 2003 incident, father and his probation officer agreed that, if father completed substance abuse counseling as required by DHS, the officer would ask the court to dismiss the latest minor in possession petition. In May 2003, then, a drug and alcohol counselor assessed father's need for treatment and concluded that father had abused alcohol but was not necessarily alcohol dependent, and that alcohol was not impairing his life. Before September 2003, father completed another program with the same counselor as the first time.

During the period following the February 2003 incident, DHS wanted to confirm that father was not drinking, so he was placed in the "color code" system. Under that system, father was supposed to sign a release and be assigned a color; he would then be required to call each morning to determine if his color had been selected and report for testing by 10:30 a.m. on days when it was. Father disagreed with DHS about the need for such testing and refused to comply, complaining to Holmes that he was submitting to urinalysis testing (UAs) elsewhere, though he would not identify where or why. (Later, at the termination hearing, father explained that he provided UAs through his drug and alcohol treatment program.) After three months of noncompliance with the color code program, despite its inclusion in father's service agreement with DHS, Holmes warned father that time was running out and that he needed to participate in services in order to establish that it would be safe to return child to his care. Father continued his refusal, asserting that time was running out for DHS, not for him.

Father finally signed up for the color code system the following month, in June 2003, but then failed to appear for tests according to the established schedule. On one occasion, for example, father complained that he had not been told the time for his UA appointment, and Holmes had to remind him

that it was his responsibility to call to schedule the UA. A few days later, Holmes again had to explain the testing times to father; when Holmes pointed out that the times were on the form that he had signed when he began the testing program, father denied ever signing the papers. Over a month later, father again denied having signed any papers until Homes gave him a copy of the form that he had signed, which showed the times for UAs. On another occasion, father complained when Holmes told him that, because he had arrived half an hour after the end of testing, he would be considered a no-show for the test.

Father attributed his noncompliance to his work schedule, although the record does not show that he ever requested a change in the testing schedule. Father stated that he was told that his testing schedule could not be changed—but the person in charge of tracking the program testified that she went over father's paperwork with him, and that paperwork, which father signed, indicated that if he had a scheduling conflict, he needed to make arrangements with his caseworker and provide documentation. Holmes also told father that if he provided a written copy of his work schedule and contact information for his supervisor, then she could change his testing schedule.

In addition to the color code random testing, DHS employees could require testing if they suspected a problem when father arrived for visitation. On two occasions, visitation center staff thought that father was under the influence, but he refused to be tested.[2] When father came for a visit in April 2003, staff were concerned that he had alcohol on his breath; DHS requested that he provide a UA, but he refused, saying that he needed to go to work, although staff told him that the test would take only about five minutes. The following June, another staff person believed that father was on drugs because, when he came to visit, his body odor was "very severe," he stumbled on the sidewalk, and he paced back and forth on the lawn during the visit. He again refused to be tested on that occasion.

---

[2] On a third occasion, DHS staff thought that father was under the influence, but when he took the UA, the results were negative.

Because DHS was concerned about father's ability to maintain sobriety, he was required to provide three clean UAs in a row. However, father missed the vast majority of the scheduled tests. Father was asked by DHS to provide a urine sample on 57 occasions between April 2003 and the termination hearing in July 2004, but actually submitted to testing only 14 times. Indeed, father did not submit to any UAs for eight months, between September 2003 and May 2004. DHS considered the missed tests, along with an occasion when the test results were "dilute," to be positive test results, though all other tests were negative. Father's failure to submit to testing caused him to miss many visits with child, so that his visits became "very irregular and sporadic."

Although his refusal to be tested caused him to miss visits, father maintained that he did not need to be tested. He testified to the view that, because he had completed treatment twice and was no longer on probation after September 2003, he should no longer have been required to do the color code system. Indeed, father so informed Holmes, though she responded that DHS still expected him to do testing in compliance with his service agreement. Nevertheless, father quit taking the UAs required under the color code system, although he still submitted to occasional testing at the visitation center. At the termination hearing, father denied ever using drugs[3] and denied drinking alcohol since completing the second treatment program.

---

[3] An incident in which father was arrested for delivery of a controlled substance (methamphetamine) raised concern that father might be using drugs. In February 2004, two police officers who were working with a confidential informant observed a car pull up and drop off father, who entered the informant's residence; the officers followed the car, checked its license plate, and then returned to the informant's home. The informant came out, got marked bills from the officers, went inside the home, came back out again, and gave the officers a bag containing methamphetamine. The car returned and the woman driving it entered the residence and then came back out with father; the driver and father left in the car, which the police then pulled over. When they searched the car, the officers found, on the driver's side, a wallet containing the marked bills. Father testified that he was unaware of the drugs and believed that he was simply picking up money owed to the woman who was driving the car. The driver later pleaded guilty to a charge of delivery of a controlled substance. The record does not reflect the outcome of the delivery of a controlled substance charge against father or whether it affected father's visits.

Alcohol treatment was not the only form of counseling that DHS believed father needed. From the very beginning of DHS's involvement with father and child, DHS wanted father to participate in counseling to address issues of violence and abuse. Disagreements between DHS and father about counseling played a significant role in the termination proceedings.

DHS's concern was prompted not only by the injury that resulted in child being taken into custody, but also by the March 2002 incident of domestic violence between father and mother and by indications that abuse had occurred in father's family. Although father told a DHS caseworker that he had never been abused, father's father had recently been charged and convicted in a criminal matter, one of father's brothers was under investigation for sexually abusing a child, and one of his father's sisters was convicted of assaulting a five-year-old and a six-year-old with an electrical cord. At a hearing, father's sister had testified that she disciplined her children the same way that she had been disciplined by her parents, and DHS was concerned that father might have experienced similar treatment.[4]

At a February 2003 hearing, the juvenile court ordered father to undergo a psychological evaluation, and he agreed to do so and to "follow all recommendations and receive positive reports." Father also agreed to "participate in counseling" and "address areas surrounding domestic violence and his own criminal thinking."

Dr. Gordon conducted a psychological evaluation the following April, when father was 17. Gordon tested father's IQ and found it to be in the low average range and found his abilities to be consistent with someone performing at a fifth-grade level. Gordon administered a personality assessment, the MMPI-2, but father's profile was invalid. Gordon noted that father was not willing to admit to even minor faults or

---

[4] Father testified that his sister "probably" was disciplined that way when she was a child but that he was not and that he was not raised by his mother. His further, somewhat curious explanation was that his mother was sick until he was seven years old and that, until that time, another sister raised him. Father was still living with his parents at the time of the termination trial.

problems and that it was likely that he was not open and forthcoming in his responses.[5] Gordon opined, based on that testing, that father would have problems with authority and that individuals with similar profiles often are impulsive, have difficulty learning from their experiences, may not see themselves as needing to conform their behavior to societal rules, and may act in asocial or antisocial ways. Such individuals often have difficulties with anger or hostility. Gordon also administered a Rorschach test and concluded that father's profile was consistent with someone who was self-centered and had an overinflated sense of self-worth: "In addition to narcissistic-like traits, there is likely to be a sense of entitlement and a tendency to put his own needs and desires ahead of those of others."

Based on testing data and father's social history, Gordon diagnosed father with alcohol dependence and with a conduct disorder of unspecified onset and further noted that father had antisocial and narcissistic personality features. Gordon observed that, in light of father's tendency to minimize problems and his unwillingness to be open and forthcoming, it would be important to verify independently whether father was continuing to use alcohol. He characterized father's unwillingness to cooperate in drug testing as "consistent with what appears to be a general self-centeredness and attitude that he does not need to essentially show others that he is able to parent." Gordon further opined that father should participate in aftercare services concerning alcohol use, have a support system that encouraged abstinence, and participate in domestic violence treatment. He concluded:

> "[Father] does not seem to realize, as discussed earlier, that giving three different accounts of what occurred [when child was injured] makes whatever he says as somewhat suspicious and makes it difficult to know what actually occurred. He is self-centered and does not seem to believe that societal rules apply to him. This may be at least partially due to his age and level of maturity, although that

---

[5] Gordon explained that an "invalid" profile would indicate that a person might have psychological problems not reflected in the test results due to inaccurate answers, but that "what is reflected is likely to be valid."

would not become fully clear until he is older. Given his age, he is young to be diagnosed with a Personality Disorder, although the lack of such diagnosis does not mean that there are not signs of a Personality Disorder currently. It would definitely be concerning if he does not participate in services fully and complet[e] them, which means attending meetings, providing urinalyses as requested, and if he does miss, letting people know in an appropriate and timely manner."

Gordon later testified that, had father been an adult, he would have diagnosed him with a personality disorder, not otherwise specified, with antisocial and narcissistic features.[6] Because of father's youth, however, the proper diagnosis at the time was a conduct disorder.[7] Gordon explained that antisocial traits such as father's would make a person turn "against society, against societal rules and conventions," and that such a person "would have difficulty conforming their own behavior to * * * societal standards, and that may include breaking the law." Gordon further opined that narcissistic traits like father's would "mean that the parent does not give adequate importance to the child's needs, and would place their own needs above that of the children."

Gordon's concerns about father's tendency to minimize his problems proved to be well founded. After father's evaluation, DHS arranged for father to receive counseling from Dr. Calvo, whose goals were to work with father on improving his judgment and on parenting skills. Father saw Calvo on only three occasions—once in May 2003 and twice in July 2003—and did not make progress in his counseling. Despite Calvo's and Holmes's (and Gordon's) explanations of

---

[6] The timing of father's evaluation appears to have been driven by DHS's need to timely assess whether to proceed toward termination. Under ORS 419B.498, DHS must petition to terminate parental rights, unless a statutory exception applies, when a child has been in substitute care under DHS's responsibility for 15 of the most recent 22 months. That statutory timeline places appropriate pressure on DHS to assess, prior to the child spending a continuous (or nearly continuous) 15-month period in substitute care, whether reunification of the family will be possible within a reasonable time, rather than to postpone that decision indefinitely. Here, child was placed in foster care in April 2002, and DHS began termination proceedings in July 2003. The psychological evaluation of father occurred in April 2003, and father turned 18 in November 2003.

[7] Gordon further indicated that about half of the adolescents diagnosed with conduct disorders go on to develop antisocial personality disorders.

the need for counseling and father's acknowledgment in the February 2003 service agreement that he would participate in counseling to address "areas surrounding domestic violence and his own criminal thinking[,]" father continued to deny that he needed counseling or even that he had been told that he needed counseling. He told Calvo that he had not intentionally hurt child and that DHS's actions were driven by racial prejudice rather than any real concerns about child abuse. Father later testified that Calvo did not know what to talk about in their counseling sessions and did not think that father needed counseling: "[I]t was always the same thing every time I went to see him, he didn't know what to say, and I'd just sit there and do nothing. And talk to him a little bit about my family." In contrast to father's version of these events, Calvo testified that he stressed the importance of counseling, but told father that, if father did not want to be there, counseling was not going to help him.

Father's resistance to counseling once it was finally ordered in February 2003 (at the earliest possible opportunity following delays attributable to father's changes in counsel) was merely a continuation of the stance he had taken from the beginning. Bailey-Lewis testified that DHS asked father to participate in counseling as early as June 2002, shortly after child was taken into DHS custody, but father resisted. After a permanency hearing in May 2003, the juvenile court found that father had not made adequate progress and that "father must actively participate in individual counseling and comply with other counseling and recommendations as requested." Holmes explained to father, even after the plan was changed from reunification to adoption, that he should continue with the services offered if he wanted to press for reunification. His response was that "he was tired of telling [her] that he doesn't need counseling."

The hearing on termination of father's parental rights took place in July and August of 2004. At some point before the hearing, father became more diligent in his visits with child. He testified at the hearing that he had visited "every Monday for months now[,]" and DHS staff agreed that father had been more consistent in his visits during the six months before the hearing.

Meanwhile, throughout the time that child has been in foster care, she has done very well. She has recovered from the fracture and is very verbal, social, and interested in learning. She has adjusted well to her foster placement and is very attached to her foster mother. One of the visit supervisors testified that, in the six months before the termination hearing, child had become reluctant to see father and on occasion cried or expressed a desire not to visit. According to the foster mother, child sometimes did not want to leave her friends at daycare to attend visits with father and has sometimes said that she does not like father. She is occasionally in a "surly mood" after visits, although she feels better after a nap. Father, however, felt that child was always happy to see him.

At the time of the termination hearing, father was working as a dishwasher and cook at a restaurant and testified that he could advance to become a full-time cook. He was living with his parents and his brother (the one being investigated for sexually abusing a child), but testified that he was planning to get a house of his own within the next month or so. Father testified that he could see no reason that child should not be returned to him that very day. He professed the belief that he had been compliant with service plans and testified, "I thought I was doing everything they wanted me to do. Except for color code."

The juvenile court found two bases for termination, both related to father's failure to participate in counseling. Specifically, the juvenile court found that, by failing to engage in counseling as requested by DHS, father, first, was unfit because of his failure to adjust his circumstances to make possible child's safe return to him and, second, neglected child by failing to present a viable plan for child's return to his custody. The court further found that father's failure to engage in counseling put child at significant risk of injury. In addition, the court found that father's explanations of child's injury were not credible:

> "I think the record is very clear that [father] was dishonest to the police at the time, that he lied to the case worker when they responded to the hospital, and that, therefore there's a, a valid and significant concern as to what actually

occurred, as it relates to [child's] injury. Even though I don't find that there's evidence to support a conclusion that [he] intentionally injured [child]."[8]

The court rejected DHS's argument that father was unfit because of addictive or habitual use of intoxicating liquors or controlled substances.

■    On appeal, father argues that the juvenile court erred in terminating his parental rights because the state failed to prove by clear and convincing evidence any of the bases alleged in the petition for termination. In fact, father continues to argue that there was no basis for requiring him to attend counseling at all. DHS argues in response that the juvenile court was correct to terminate because of father's failure to engage in counseling and cross-assigns error to the juvenile court's finding that the state failed to prove that father's parenting ability was substantially impaired by abuse of alcohol or controlled substances. After a careful review of the record, we affirm the termination of father's parental rights based on unfitness, although our analysis differs from that of the juvenile court in several respects.[9] We find that father is unfit due to the serious and unexplained injury inflicted on child while in his care, his dishonesty with regard to that injury, and his conduct disorder, all of which necessitated his participation in counseling before child can safely be returned to his care. All of these factors, taken together, constitute conduct and a condition that are seriously detrimental to child.

■    Facts supporting termination must be established by clear and convincing evidence, which means that "the court must find that the evidence establishes that the truth of the facts asserted is highly probable." *State ex rel Dept. of Human*

---

[8] A parent's untruthful answers during a termination proceeding are not a ground for termination of parental rights unless the parent's lack of honesty is seriously detrimental to the child. *State ex rel Dept. of Human Services v. Smith,* 338 Or 58, 85-86, 106 P3d 627 (2005). Here, although father's lack of candor with child's doctors could have caused delays in child's receiving appropriate medical care, there is no evidence that there was any actual, serious detriment to child as a result of that lack of candor.

[9] Because we affirm the judgment based on unfitness, we need not reach the question whether termination was also proper based on neglect. *See generally State ex rel Dept. of Human Services v. Squiers,* 203 Or App 774, 126 P3d 758 (2006).

*Services v. Smith*, 338 Or 58, 79, 106 P3d 627 (2005) (citations omitted). The standard "requires a showing that it is highly probable that [the parent is] not presently able, and will not be able within a reasonable time, to meet [the child's] physical and emotional needs." *State ex rel SOSCF v. Mellor*, 181 Or App 468, 474, 47 P3d 19 (2002), *rev den*, 335 Or 217 (2003) (citation omitted).

■    The criteria for termination of parental rights based on parental unfitness are set forth in ORS 419B.504. That statute provides, in part:

> "The rights of the parent or parents may be terminated * * * if a court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

> "(1)    Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child * * * for extended periods of time.

> "* * * * *

> "(3)    Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

> "* * * * *

> "(5)    Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child * * * to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

As the Supreme Court has observed, both parts of the two-part test contained in ORS 419B.504 must be met before the court orders termination:

> "First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or

condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change.' "

*State ex rel SOSCF v. Stillman*, 333 Or 135, 145, 36 P3d 490 (2001); *see also Smith*, 338 Or at 80-81.

We begin, then, by examining whether father is unfit—that is, whether he has engaged in some conduct or is characterized by some condition that is seriously detrimental to child. We first consider DHS's argument that father is unfit because of an addictive or habitual use of alcohol that substantially impairs his parenting ability. *See* ORS 419B.504(3). DHS contends that father's refusal to participate in the required UAs adversely affected his ability to parent by necessitating the cancellation of visits and that his arriving for two visits apparently intoxicated shows that he did not have control over his alcohol use. However, the record does not contain clear and convincing evidence that father habitually used alcohol at the time of the termination hearing.[10] *See Smith*, 338 Or at 83 (the court must consider the parent's fitness at the time of the termination hearing). Although father failed to show up for UAs, the record does not disprove father's testimony that he stopped drinking after he completed the second treatment program. And although there is some evidence that father is dependent on alcohol, the record lacks sufficient evidence that his dependence substantially impairs his parenting ability.

The record does contain clear and convincing evidence, however, of conduct and a condition that are seriously detrimental to child. Here we note, as we did in *Mellor*, that we are addressing a complex record containing a number of factors that influence our conclusion that father is presently

---

[10] Although father's arrest for delivery of methamphetamine (which took place about five months before the termination hearing) is further cause for concern in light of the antisocial features of his conduct disorder, the record does not contain clear and convincing evidence that father *used* methamphetamine at all.

unfit to parent child. 181 Or App at 476. As in *Mellor*, that a single factor, standing alone, might not support termination is not determinative of whether father is unfit. *Id.* Child "is exposed to all of the proven conduct and conditions together, and our unfitness determination is similarly based on consideration of that combination of conduct and conditions and on whether that combination is seriously detrimental" to child. *Id.*

■       Moreover, as in *Mellor*, we conduct our inquiry "not in the abstract but with emphasis on the practical effect of * * * father's conduct and conditions" on child. *Id.* at 477. As the Supreme Court has recognized, the broader context of our inquiry arises under ORS 419B.090, which declares that it is the "policy of the State of Oregon to recognize that children are individuals who have legal rights," including the right to "[p]ermanency with a safe family." ORS 419B.090(2)(a), *cited in Stillman*, 333 Or at 146. Consistently with that policy, "the focus of both parts of the test for termination under ORS 419B.504 is on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract." *Stillman*, 333 Or at 146.

Here, we begin with the fact that child suffered a serious and unexplained injury at father's hands. That injury has never been satisfactorily explained, and we agree with the juvenile court's view that father's various explanations for the injury are not credible. Indeed, father's shifting stories, none of which seems to account for the severity of child's injury, heighten rather than lessen the concern about child's safety in father's care because they suggest that father is trying to conceal what actually happened. The medical testimony suggests a 70 to 75 percent likelihood that child's injury was caused by abuse. When we couple that likelihood with father's attempts to cover up the actual cause of child's injury, we conclude that the injury was the result of conduct by father that was, at the very least, reckless and very likely intentional. That conduct was obviously detrimental to child and rendered father unfit within the meaning of the statute.

Our task, however, is to assess whether, at the time of the termination trial, father was presently unfit. *See*

*Stillman*, 333 Or at 149. Here, where father has not had unsupervised contact with child during the time that she has been in DHS custody, that inquiry consists primarily of an assessment of father's efforts to ensure child's safe return. Given the severity and nature of the injury that child suffered at father's hands, those efforts necessarily would include meaningful participation in counseling. Moreover, during the course of DHS's involvement with the family, other concerns came to light that further established father's need for counseling. Father, a minor, was under juvenile court supervision for alcohol-related offenses. There were incidents of domestic violence in father's relationship with mother and in father's own family. Although father denied that he had suffered physical abuse himself, he acknowledged that abuse had occurred in his home (at least that his sister had probably suffered abuse).

Additionally, Gordon's evaluation of father—in addition to establishing the existence of a *condition* detrimental to child—strongly supports our conclusion that father would need to make significant progress in counseling before child could be safely returned to his care. As noted above, father has been diagnosed with a conduct disorder[11] and has exhibited antisocial and narcissistic tendencies that Gordon believed would negatively affect father's ability to parent. According to Gordon, father's psychological condition makes it difficult for him to conform to societal standards and expectations and renders him unable to place a child's needs above his own needs. Although of course a diagnosis alone does not suffice to demonstrate that conduct or a condition is seriously detrimental to a child, *Mellor*, 181 Or App at 477, a diagnosis such as father's, when coupled with an injury to an infant at father's hands, as well as father's steadfast resistance to mental health treatment, does establish the existence of a *condition* seriously detrimental to child.

Father's failure to engage in counseling constituted *conduct* seriously detrimental to child. All of the factors we

---

[11] Pertinent features of that disorder include physical and verbal aggression, deceitfulness, and violation of societal norms and rules. *Diagnostic and Statistical Manual of Mental Disorders* 98-99 (4th ed 2000 - Text Revision).

have identified—child's initial unexplained injury, the violence in father's family and in his relationship with mother, his alcohol-related offenses, and his diagnosis with a conduct disorder that is characterized by problems with anger and an unwillingness to conform to societal expectations—established that child cannot be returned to father's care until father engages in counseling. Yet father has consistently resisted the services offered by DHS and has maintained that he does not need such services and is a perfectly adequate parent. Although he participated in parenting classes early on, the various service providers who testified at trial all found him to be resistant and even hostile to suggestions regarding his parenting skills and questioned whether father was incorporating lessons from the classes into his interactions with child. Although the post test finally did indicate some benefit to father from the parenting classes, he had to be hounded to take the test. Over and over again, father denied having been informed of services available to him or requirements to which he was subject, even after having assented to the information in writing.

Holmes, the case manager during the time period after the court finally attained jurisdiction over father, testified that she worked on the case on an almost daily basis and spoke with father regularly in an effort to keep him on task and ensure his progress, yet found him to be consistently belligerent and hostile. Father frequently denied that he had been informed of issues that were the subject of repeated conversation, including the reasons why he was being required to participate in counseling. Holmes's efforts to impress on father the importance of participating in counseling and other services before the expiration of the 15-month period during which DHS was required to assess the prospects for reunification were met with father's assertion that it was DHS, not he, that was running out of time. Father dismissed Holmes's efforts to encourage his participation in counseling even after the change in the permanency plan with the comment that he was "tired of telling [her]" that he did not need counseling. Father's persistent refusal to meaningfully engage in counseling services to address his problems left

DHS with no alternative but to proceed toward termination.[12]

We recognize that hostility toward DHS, standing alone, is not evidence of conduct or a condition seriously detrimental to child. *See Smith*, 338 Or at 84. Here, however, father's hostility toward DHS was part of a general refusal to participate in services that would have been an essential part of establishing that it was safe to return child to father's care. Unlike other cases in which courts have struggled over whether the efforts demanded of parents were reasonably imposed,[13] here DHS's recommendation that father participate in counseling and its requirement that he submit to random UAs were clearly reasonable measures for assuring that child could be safely returned home. And, unlike other cases in which parents' limited success in cooperating with services has caused us to struggle to assess whether the parents have effected a lasting adjustment of the conduct or condition at issue,[14] here father's efforts have been confined to attending

---

[12] Under ORS 419B.498(2), exceptions to the timeline for a termination petition exist if (a) the child is being cared for by a relative who is intended to provide a permanent placement, (b) there is a "compelling reason"—such as the parent's successful participation in services, the existence of a different permanent plan that would better meet the child's needs, or a previous finding by a court or citizen review board that DHS failed to make reasonable efforts—to believe that termination is not in the child's best interests, or (c) DHS has failed to provide services. None of those exceptions existed here.

[13] *See Smith*, 338 Or at 82-86 (DHS's requirement that the mother move out of her parents' home was unreasonable: home was not detrimental to the child where no child had been harmed in grandparents' home, sex offenders who previously visited home had since died, foster son who acted out sexually had left home, and family's hostility toward DHS did not affect the child); *State ex rel Juv. Dept. v. Nguyen*, 194 Or App 604, 620-22, 96 P3d 1219, *rev den*, 337 Or 657 (2004) (*Nguyen II*) (parents' unwillingness to acknowledge that one of them was responsible for severe abuse of older child did not justify termination of parental rights in youngest child where parents had undergone three and one-half years of therapy and provided excellent care to youngest child).

[14] *See State ex rel Juv. Dept. v. Nguyen*, 182 Or App 294, 305-06, 48 P3d 864 (2002), *aff'd in part and vac'd in part*, 335 Or 255, 66 P3d 1025 (2003) (*Nguyen I*) (where parents completed parenting classes and general course work but had not addressed specific problem of severe physical abuse of the child, parents were not fit); *State ex rel Juv. Dept. v. Proctor*, 167 Or App 18, 29-30, 2 P3d 405, *adh'd to on recons*, 169 Or App 606, 10 P3d 332 (2000) (where the mother was determined to improve her parenting skills, complied with service agreements, and made progress after separating from the abusive father, reunification was possible and termination was inappropriate).

parenting classes that he maintained he did not need and inconsistent participation in visitation, while he refused to participate in counseling or to cooperate with UAs. Not only did father maintain at trial that he did not understand why child could not be returned to him that very day, despite his failure to cooperate with such services, but he continues to maintain on appeal that he does not need counseling.

On this record, in addition to his conduct disorder, father's conduct during the pendency of these proceedings is seriously detrimental to child because it represents an utter failure to meaningfully participate in reasonable efforts to ensure her safe return. Father's resistance to such efforts continued up until the day of trial and, indeed, continues on appeal. As a result, after child has spent all but two months of her life in foster care, no progress has been made to ensure her safe return home. Where a child has been removed under circumstances that indicate that a parent poses a serious threat to the child's safety, we need not subject the child to further risk of harm by returning her to that parent's care in order to conclude that harm is imminent enough to justify termination when the parent has utterly failed to make any adjustment, let alone a lasting one, to his parenting skills to make it possible for the child to safely return home. We are satisfied that father is presently unfit to parent child.

Where, as here, the parent is unfit, the court must consider whether it is improbable that the child can be reintegrated into the parent's home within a reasonable time. *Stillman,* 333 Or at 145-46. ORS 419A.004(20) defines "reasonable time" as "a period of time that is reasonable given a child['s] * * * emotional and developmental needs and ability to form and maintain lasting attachments." Here, by consistently refusing services, father has made no progress towards demonstrating that child can be reintegrated into his home at any time in the foreseeable future, let alone a reasonable time. Indeed, although father now faults DHS for not arranging for counseling until May 2003 and then deciding to seek termination in July 2003, he nevertheless continues to maintain that he does not need counseling. DHS's efforts to provide counseling to father began as early as June 2002 and continued as late as December 2003, when father told Holmes that he was tired of telling her that he did not

need counseling. Meanwhile, child has spent all but two months of her life in foster care. There is no basis for finding that child can be reintegrated at any time, let alone a reasonable time, given her circumstances.

■    Finally, we find that termination of father's parental rights is in child's best interests. ORS 419B.500. Child has lived with her foster mother for all but two months of her life. She is doing well in that placement, is attached to her foster mother (who is an adoptive resource), and has begun to react negatively to some visits with father. " 'Where a parent is unable or unwilling to rehabilitate himself * * * within a reasonable time so as to provide a [wholesome and healthful] environment, the best interests of the chil[d] generally will require termination of that parent's parental rights.' " *Mellor*, 181 Or App at 493 (quoting *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 189, 796 P2d 1193 (1990)) (first bracketed material in *Mellor*). Postponing a decision regarding permanency is not in the child's best interests where, as here, the parent has shown no inclination to adjust his circumstances to allow for her safe return. Accordingly, we are persuaded that termination is in child's best interests.

Affirmed.